UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| ADAM BOGART, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Case No. |
| v. ) | 16-cv-00255-JMH |
| ) | |
| UNIVERSITY OF KENTUCKY, ) | |
| ) | |
| Defendant. ) | **MEMORANDUM OPINION & ORDER** |
| ) | |

\*\*\*

This matter is before the Court upon Defendant's Motion for Summary Judgment [DE 35; *see also* DE 38]. Plaintiff has filed a Response [DE 38], stating his opposition to the Motion for Summary Judgment, and Defendant has filed a Reply [DE 40] in further support of their Motion. This motion is now ripe for consideration and, for the reasons stated below, will be granted.

**I.**

The facts before the Court are relatively straightforward. In the 1980s, Plaintiff was diagnosed with Tourette Syndrome and dystonia, a condition causing weakness and mild motor deficiency in the hand that developed as a result of a reaction to a prior medication for the treatment of Tourette's. Pl. Dep. at 69-70. His symptoms are well controlled and do not significantly affect

his ability to work. Pl. Dep. at 71-75. Plaintiff's symptoms are so well-managed that people often do not notice them. Pl. Dep. at 71-72. One symptom, more than any other, remains even with effective management of Tourette Syndrome with medication: his head shakes from left to right in a "no" motion, once every minute or every few minutes. Bogart Decl. at 5.

Among other degrees, Plaintiff has a Ph.D. in Behavior Neuroscience from Kent State University. Pl. Dep. 20-21. After obtaining his doctorate degree, he worked as a post-doctoral fellow in radiology at the Gruss Magnetic Imaging Center at the Albert Einstein School of Medicine in the Bronx, a position that he left when his contract was not renewed. Pl. Dep. at 21-27. Two years later, in December 2013, Plaintiff applied online for a research position with Dr. Ai-Ling Lin, who was transitioning her research from the University of Texas Health Service Center at San Antonio, in Texas, to the University of Kentucky. Pl. Dep. at 41-42. Lin joined the University of Kentucky's Sanders-Brown Center on Aging in March 2014, and maintains a medical research laboratory there.[1] Lin Aff at ¶ 2. Thus, after some

---

[1] Dr. Lin's professional interests and specialties include neuroimaging, functional magnetic resonance imaging (fMRI), positron emission tomography (PET), brain metabolism, cerebral blood flow, brain aging, risks for Alzheimer's disease, and dietary effects on cognitive aging. Lin Aff. at ¶ 2. Upon joining the University, the main focus of Dr. Lin's research was in the effects of calorie restriction on mice brains as a device

2

initial remote discussions and correspondence, Lin and Plaintiff met for an interview at the University of Kentucky in March 2014. Pl. Dep at 48. Lin described her areas of research and prospective projects to Plaintiff and indicated scientific topics with which she needed him to be familiar. Pl. Dep. at 51. He told her that he would need to refresh his knowledge on a few topics but possessed the skill and knowledge to perform the job. Pl. Dep. at 51-52, 55-56. Plaintiff was eventually hired as a Senior Laboratory Technician in the Sanders-Brown Center for Aging at the University of Kentucky, where he was one of the first employees in Lin's new lab. Pl. Dep. at 55.

Upon commencing work at the University in Lin's lab in June 2014, Plaintiff was primarily tasked with conducting statistical analysis of a set of research data purchased by Lin for a larger project studying the effects of calorie restriction on the brains of mice. Pl. Dep. at 56-57. Plaintiff believed the data was flawed and that using the data in Lin's research would be improper. Pl. Dep. at 90-91. On one hand, Plaintiff claims that he tried to express his concerns to Lin but she refused to hear his concerns. Pl. Dep. at 64. However, he also admits that he discussed these concerns with her several times over the course of his employment. Pl. Dep. at 65-68. Plaintiff further

---

to gain insights into Alzheimer's disease in humans. Pl. Dep. at 56-57.

testified that Lin was rude and hostile towards him, as evidenced by Lin asking Plaintiff whether he was able to understand her English and whether he had the experience to do certain tasks. Pl. Dep. at 85-88; Aug. 1, 2014 Email Exchange between A. Lin and A. Bogart, Ex. 3; Aug. 4, 2014 Email Exchange between A. Lin and A. Bogart, Ex. 4.

Sometime on or just shortly before August 1, 2014, Lin called Bogart to her office and asked him about the fact that he regularly shook his head back and forth, asking him whether he had Parkinson's disease. Bogart Decl. at ¶ 15. He explained that he did not but that he did have lesions on his brain. *Id.* According to Bogart, Lin then became angry and questioned why he had not told her about the lesions on his brain during their interview and asked him for his diagnosis, at which time Bogart disclosed that he has Tourette Syndrome.

Perhaps for this reason, when Plaintiff wrote an email to Lin on August 1, 2014, he explained that he "ha[s] a slower learning curve than is usual for what you expect" but "all of a sudden, I completely 'get' it." [DE 35-5 at 234.] She responded that her "concern [wa]s not the speed of your learning curve, but the skills and professionalism you should already have after your Ph.D. training and so many years of experiences, e.g., the statistical analysis ability, finding pattern of and the meaning

behind the data. Again, the misplacing numbers/orders has been considered a serious one." *Id.*

Plaintiff was informed by Lin numerous times that his performance was not meeting expectations. Pl. Dep. 111-15, 127, 135, 139; Aug. 26, 2014 Oral Warning Notice, Ex. 5; Lin Aff at ¶ 5. Specifically, Plaintiff interchanged headings and/or numbers in lists of data on at least three occasions. Pl. Dep. at 126-27; Ex. 4. These lists contained data comparing four different groups of mice with different characteristics (such as "calorie restricted" and "not calorie restricted") to see what effect calorie restriction had on the brains of mice. Lin Aff. ¶ 6. Plaintiff mislabeled the data and/or swapped numbers in the lists at least three separate times. Lin Aff. At ¶ 6. Lin discovered these mistakes and instructed Plaintiff to correct them. Lin Aff. at ¶ 6. Plaintiff admits these mistakes but insists that they were minor and that Lin was overreacting in reprimanding him. Pl. Dep. at 112-13. However, Lin clearly indicated to Plaintiff that these mistakes were serious and must be remedied. Pl. Dep. at 113; Ex. 3. Indeed, from a scientific standpoint, these mistakes were quite serious because labeling one set of data as if it relates to a different group or changing numbers in a data set completely invalidates the information and makes it meaningless. Lin Aff. at ¶ 6. According

to Lin, to analyze and interpret data that has been mislabeled or changed could mislead the scientific community and constitute research misconduct. Lin Aff. at ¶ 6.

There were other issues during Plaintiff's time in Lin's lab. He worked more than 40 hours a week without approval on several occasions and attended medical appointments without properly clocking in and out. Pl. Dep. at 106-07; Ex. 5. As a full-time non-exempt employee, Plaintiff was informed on several occasions that he must not work more than 40 hours per week unless approved by Lin, he may not do work without pay, and he may not remain clocked in while attending appointments out of office. Pl. Dep. at 106-07, 141; Ex. 5; June 26, 2014 Email Exchange between A. Bogart, A. Lin, V. Bakshi, B. Baesler, and M. Waechter, Ex. 6; Aug. 23, 2014 Email Exchange between A. Lin and A. Bogart, Ex. 7. Plaintiff admits he made these mistakes clocking in and out. Pl. Dep. at 141. Additionally, Plaintiff was found to have been sleeping in the lab, socially chatting during work hours, and communicating with a sales representative in a manner outside his job description. Ex. 5. Additionally, Plaintiff was not timely completing the tasks assigned to him even after extensions were granted. *Id*. Plaintiff admits to these performance issues but asserts that they were either so minor as to be unimportant, things that he could not even recall, or that his problems with completing tasks were

6

justified because of the flaws that he perceived were present in the data he was tasked with analyzing. Pl. Dep. at 97-98; 150-51.

Plaintiff met with Lin, Beverley Baesler, Sanders-Brown Center Administrator II, and Mary Fern Waechter, Sanders-Brown Center Administrator III, to address these performance issues on August 26, 2014. Pl. Dep. at 140-41. Plaintiff was informed of areas in which he needed to improve and it was expected that they would meet again to follow up on his progress. Pl. Dep. 157-58; Ex. 5. This meeting was designated an Oral Warning and Plaintiff was given a letter summarizing the information covered. Ex. 5. Plaintiff was instructed that a follow up meeting would be scheduled after September 2, 2014 to assess his level of improvement toward satisfactory performance. Pl. Dep. at 158. At that meeting, Bogart attempted to explain the problems that he had found with the data and why that was preventing him from completing the work in the way that Lin expected, but he was cut off by the administrators in the meeting who said they "didn't understand science." Bogart Decl. at 22.

Between August 26 and September 4, 2014, Lin observed that Plaintiff showed no improvement towards satisfactory performance. Lin Aff. at ¶ 8. Furthermore, during this period, Plaintiff ignored specific instructions Lin gave him and failed

7

to complete tasks he was assigned with no explanation for either. Lin Aff. at ¶ 8. Additionally, Plaintiff was rude and insubordinate toward Lin by ignoring her when she spoke to him and speaking to her in a rude and derogatory manner. Lin Aff. at ¶ 8. Of course, Bogart claims that his behavior toward Lin was never intended to be rude or insubordinate but that she became angry and raised her voice at him if Bogart's results did not meet her expectations or if he made minor errors. Bogart Decl. at 20.

Ultimately, on September 4, 2014, Plaintiff was separated from employment from the University. Pl. Dep. at 98. At the time of termination, Plaintiff was still in his initial probationary phase of employment. Pl. Dep. at 99. After his separation from employment with the University, Plaintiff made a complaint with the University's Office of Institutional Equity and Equal Opportunity ("OIEEO") claiming "wrongful termination due to discrimination (Tourette's Disorder)". Pl. Dep at 167; Sep. 5, 2014 Email Exchange between A. Bogart and P. Bender, Ex. 8. Patty Bender, Assistant Vice President for Equal Opportunity responded to Plaintiff's complaint. Pl. Dep at 167; Ex. 8. Bender requested that Plaintiff provide to her any information or documentation he had to support his complaint. Pl. Dep. at 170. Plaintiff eventually provided Bender a series of emails culminating in a 97 page "report" detailing Plaintiff's

complaints regarding his separation from employment and concerns regarding the data he was tasked with analyzing. Ex. 8; Sep. 10, 2014, 3:05pm Email Exchange between A. Bogart and P. Bender, Ex. 9; Sep. 10, 2014, 8:28pm Email between A. Bogart and P. Bender, Ex. 10; Sep. 12, 2014, 9:35pm Email Exchange between A. Bogart and P. Bender, Ex. 11; Sep. 12, 2014, 10:26pm Email Exchange between A. Bogart and P. Bender, Ex. 12; Sep. 14, 2014 Email Exchange between A. Bogart and P. Bender, Ex. 13; Sep. 17, 2014 Email Exchange between A. Bogart and P. Bender, Ex. 14; Sep. 23, 2014 Email Exchange between A. Bogart and P. Bender, Ex. 15. An investigation was conducted and Plaintiff's discrimination claim was found to be meritless. Pl. Dep. at 186-87; Oct. 17, 2014 Email Exchange between A. Bogart and P. Bender, Ex. 16; Oct. 17, 2014 Decision Letter from P. Bender to A. Bogart, Ex. 17. This lawsuit followed.

## II.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986)). The Court reviews all evidence and draws all inferences in the light most favorable to the nonmoving party. *Chapman v. UAW Local 1005,* 670 F.3d 677, 680 (6th Cir.2012) (en banc); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The question is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

**III.**

The Eleventh Amendment bars all suits by private litigants in federal court against states and their agencies. *See Alabama v. Pugh*, 438 U.S. 781, 781 (1978) ("[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies."). The University of Kentucky is an agency of the Commonwealth of Kentucky and entitled to sovereign immunity. *See Jackson v. University of Kentucky*, 2016 WL 3951084 (E.D. Ky. 2016). While sovereign immunity may be abrogated by Congress, *see Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984), Congress has not done so with respect to the specific type of Americans with Disabilities Act claim asserted by Plaintiff in this matter. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 374 (2001) (finding state sovereign

immunity not abrogated by Title I of the ADA). Accordingly, Plaintiff's Amended Complaint for money damages based on the ADA is barred by sovereign immunity and must be dismissed for lack of jurisdiction. *See Huffer v. University of Kentucky*, 5:11-cv-417-KSF, 2013 WL 431823 at *3 (E.D. Ky. 2013).

**IV.**

Turning to Plaintiff's KCRA claim, courts interpret the Kentucky Civil Rights Act with respect to a plaintiff's claim of disability discrimination under KRS 344.040 by borrowing from federal law.[2] *See e.g.*, *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706 (Ky Ct. App. 2004); *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589 (Ky. 2003). Thus, to succeed on such a claim, "a plaintiff must show that: 1) he is an individual with a disability; 2) he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and 3) he was discharged solely by reason of his handicap." *Jakubowski v. Christ Hosp. Inc.*, 627 F.3d 195, 201 (6th Cir. 2010) (quoting M*onette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). The employee has the burden of proposing an accommodation that will permit him to effectively perform the essential functions of his job. *Id.* at 202. "Since this

---

[2] The Court exercises its discretion to maintain jurisdiction of this state law claim after dismissal of all federal claims, considering the interests of judicial economy balanced against the avoidance of needlessly deciding state law claims. *Harper v. AutoAlliance International, Inc.*, 392 F.3d 195, 211-12 (6th Cir. 2004). This case is ready for trial after the resolution of the present motion, and the trial date is only a few weeks away.

11

formulation of the test, the Sixth Circuit has recognized that the disability need not be the *sole* reason for the adverse action, although the plaintiff must establish that her employer acted 'because of' her disability, that is, 'but for' causation." *Bracey v. Michigan Bell Tel. Co.*, No. 14-12155, 2015 WL 9434496, at *9 (E.D. Mich. Dec. 24, 2015) (quoting *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012)).

Even assuming a plaintiff can make out a prima facie case of discrimination, he must present evidence for a jury to reasonably find that the defendant's asserted reasons for the termination of his employment were pretextual. *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999). "A plaintiff must do more than simply impugn the legitimacy of the asserted justification for [his] termination; in addition, the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Id*. (quoting *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994)).

On the undisputed facts before the Court, Plaintiff's claim fails as a matter of law for a jury could not reasonably find that Plaintiff would not have been fired "but for" his disability. Further, he has not produced evidence from which a jury might reasonably reject the employer's legitimate,

nondiscriminatory explanation for the termination of his employment: unsatisfactory performance.

Plaintiff insists that Lin's knowledge of and her disposition against his condition with Tourette Syndrome must have been the only reason that his employment was terminated because any dissatisfaction over his performance for Defendant's stated reasons has been blown out of proportion. He does not argue that Lin was not dissatisfied with his performance only that she should not have been, in his opinion. Whatever Plaintiff feels about Lin's opinion of his performance, it does not change the fact that, on at least three separate occasions, Plaintiff mislabeled and swapped data entries on a particular assignment even after Lin indicated these mistakes must be corrected and should not be repeated, which was unacceptable to her. Pl. Dep. 113; Ex. 5., Pl. Dep. 114; Ex. 3; Ex. 4; Aug. 5, 2014 Email Exchange between A. Lin and A. Bogart, Ex. 20. Nor does it change the fact that Plaintiff had to be cautioned not to work without pay, not to work more than forty hours per week, and to make sure that he "punched in and out" prior to beginning work and when leaving the office. Pl. Dep. 106; Ex. 7. Nor does it change the fact that Plaintiff was informed that his progress on his "main initial project" was slower than expected, Ex. 5; Pl. Dep. 150-51, and that, having been so advised, he had made no significant progress more than a week later. Ex. 5; Pl. Dep.

150-51. Neither does it change the fact that Plaintiff was found sleeping at work, chatting socially during work hours, and communicating with sales representatives in a manner outside his job description. Ex. 5. These infractions were communicated to Plaintiff in person, via email, and in writing in the form of an Oral Warning notice on August 26, 2014. Ex. 5. Plaintiff was instructed on steps to improve his performance and a follow up meeting was scheduled for the first week of September to assess his progress. Ex. 5. However, Plaintiff failed to make such improvements and exhibited further insubordinate behavior and unsatisfactory performance, including ignoring Lin's explicit instructions; failing to complete assignments without explanation; and speaking to Lin in a rude and derogatory manner. Lin Aff. at ¶ 8. In other words, the Court does not believe that there is sufficient evidence in support of Plaintiff's argument for a reasonable jury to conclude that Plaintiff would not have been fired "but for" his disability. Summary judgment would be appropriate on this ground alone.

That said, the Court also rejects Plaintiff's argument that there is a genuine dispute of fact as to whether the non-discriminatory, performance-based reasons given for the termination of his employment were merely pretext for disability discrimination by his supervisor because Lin had asked him about his neurological condition and expressed – in his words – anger

that he had not disclosed it during his interview. He argues that a reasonable jury could determine that the reasons were pretextual because his performance issues should not have been considered important enough to merit his dismissal from employment by Lin and, further, because he was informed that his employment might be terminated if his performance did not improve less than one month after their exchange about his condition and, then, his employment was terminated within six days of that warning.

Again, the Court is unpersuaded. The mere fact that the parties had discussed Plaintiff's medical condition is not enough, even when coupled with Plaintiff's conclusory efforts to downplay the seriousness of his errors and other performance issues. In fact, when Plaintiff wrote to Lin on August 1, 2014, explaining that he "ha[s] a slower learning curve than is usual for what you expect" but "all of a sudden, I completely 'get' it," she responded that her "concern [wa]s not the speed of your learning curve, but the skills and professionalism you should already have after your Ph.D. training and so many years of experiences, e.g., the statistical analysis ability, finding pattern of and the meaning behind the data. Again, the misplacing numbers/orders has been considered a serious one." [DE 35-5 at 234.] Even though she acknowledged his medical condition, Lin repeatedly cited her concerns with errors in

15

Plaintiff's work and his general performance on the job – the stated reason for the termination of his employment. Plaintiff does not deny these facts. Plaintiff's conclusory argument about the relative seriousness of his errors and other performance issues are simply not enough to survive summary judgment without more.

The Court finds there are no genuine issues of material fact in dispute and that, on the evidence available, Defendant is entitled to summary judgment on all remaining claims.

Accordingly, **IT IS ORDERED** that Defendant's Motion for Summary Judgment [DE 35] is **GRANTED**.

This the 5th day of December, 2017.

Signed By:
*Joseph M. Hood*
Senior U.S. District Judge